UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

WATERKEEPERS NORTHERN
CALIFORNIA, a non-profit
corporation, doing business as
DELTAKEEPER, and BILL
JENNINGS, an individual;

No. CIV-S-00-1967 MCE/PAN

     Plaintiffs,

  v.

MEMORANDUM AND ORDER

AG INDUSTRIAL MANUFACTURING,
INC., a corporation; and
CLAUDE E. BROWN, an
individual;

     Defendants.

----oo0oo----

This is an action for violation of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq., hereinafter referred to as the "Clean Water Act."

///

///

///

///

Plaintiffs allege that Defendants AG Industrial Manufacturing, Inc. and its president, Claude E. Brown, have repeatedly discharged industrial pollution into the Mokelumne River and the San Joaquin River Delta ever since Defendants became subject to the provisions of the Clean Water Act in 1992.  Plaintiffs now move for summary judgment, or alternatively for summary adjudication of claims, on grounds that the evidence demonstrates as a matter of law Defendants' continuing failure to comply with the requirements of the Clean Water Act.  Defendants, in turn, have filed their own cross-motion for summary judgment or summary adjudication.  As set forth below, while summary judgment is denied as to both parties, summary adjudication as to certain claims will be granted.

**STATUTORY OVERVIEW**

The Federal Water Pollution Control Act, 33 U.S.C. § 1251, et seq. (hereinafter referred to as the "Clean Water Act" or "CWA"), was adopted by Congress in 1972 "to restore and maintain the chemical, physical and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To effectuate that goal, the CWA prohibits the discharge of any pollutant into "navigable waters", unless such discharge is in compliance with CWA provisions.  33 U.S.C. § 1311(a), 1342(b)-(c).  The term "navigable waters" is interpreted broadly to include any canal, ditch or storm sewer system which ultimately, either directly or indirectly, flows (even if only periodically) into a waterway of the United States. ///

1  Headwaters, Inc. v. Talent Irrigation District, 243 F.3d 526, 534

2  (9th Cir. 2001); *see also* United States v. Eidson, 108 F.3d 1336,

3  1342 (11th Cir. 1997).

4      The CWA does authorize the discharge of limited amounts of

5  pollutants pursuant to permits obtained pursuant to the National

6  Pollution Discharge Elimination System ("NPDES").  The

7  Environmental Protection Agency ("EPA"), however, which is

8  responsible for CWA enforcement authority, has delegated

9  enforcement duties in California, pursuant to 33 U.S.C. §

10  1342(p), to the State of California, acting through its State

11  Water Resources Control Board (the "State Board").  In November

12  1991, the State Board issued Water Quality Order 91-13-DWQ

13  ("State Order") which created a statewide general permit for

14  industrial storm water dischargers.  This Order, as subsequently

15  amended, prohibits discharges which (1) cause or threaten to

16  cause pollution, contamination, or nuisance; (2) adversely impact

17  human health or the environment; or (3) cause or contribute to an

18  exceedance of any applicable water quality standards contained in

19  a Statewide Water Quality Control Plan or an applicable Regional

20  Water Board plan.  State Order, Section A.2, C.1-2, attached to

21  the Decl. of Andrew Packard as Ex. A.

22      Dischargers of industrial pollutants are required to submit

23  a Notice of Intent ("NOI") to the State Board, signifying their

24  intent to comply with the provisions of the State Order.

25  ///

26  ///

27  ///

28  ///

Thereafter, the facility operator must develop and implement a written Storm Water Pollution Prevention Plan ("SWPPP") that identifies both on-site sources of pollutants and best management practices ("BMPs") designed to prevent or reduce discharge of those pollutants into storm water.

Implemented BMPs must meet the standards of Best Available Technology Economically Achievable ("BAT") for toxic pollutants and Best Conventional Pollutant Control Technology ("BCT) for conventional pollutants like total suspended solids.  State Order, Section B.3.  Where BMPs outlined within a facility's SWPPP are inadequate in eliminating pollutant discharge, the facility must revise and update the SWPPP with further efforts to improve the quality of its discharge.

A discharging facility must also, in addition to formulating an adequate SWPPP, perform water monitoring and submit periodic reports concerning the results of its monitoring efforts.

Numeric limitations on pollutant discharges are required for industrial facilities with specified Standard Industrial Codes ("SICs").  If a facility is not designated by its SIC (as set forth in 40 C.F.R. Subchapter N) as being subject to such numeric limitations, the facility must still meet EPA benchmark values, which are defined as follows:

> The "benchmarks are the pollutant concentrations above which EPA determined represents a level of concern.  The level of concern is a concentration at which a storm water discharge could potentially impair, or contribute to impairing, water quality or affect human health from ingestion of water or fish.  The benchmarks are also viewed by EPA as a level, that if below, a facility represents little potential for water quality concern.  As such , the benchmarks also provide an appropriate level to determine whether a facility's storm water pollution prevention measures are successfully implemented.

4

**The benchmark concentrations are not effluent limitations and should not be interpreted or adopted as such.** These values are merely levels which EPA has used to determine if a storm water discharge from any given facility merits further monitoring to insure that the facility has been successful in implementing a storm water pollution prevention plan. As such these levels represent a target concentration for a facility to achieve through implementation of pollution prevention measures at the facility.

*See* Federal Register, Vol. 60, No. 189, Friday, September 29, 1995 (emphasis added).

The California Toxics Rule ("CTR"), established effective May 18, 2000, sets forth water quality standards applicable to toxic pollutants such as lead, cadmium, copper and zinc in storm water discharges within the State of California. The CTR imposes numeric pollutant limitations generally more stringent than the EPA benchmarks for protected waterways in California, and required that such limitations be satisfied even for facilities whose SICs would not otherwise subject them to such limitations. For purposes of this case, the CTR specifically applies to the Mokelumne River.

The Clean Water Act is a strict liability statute. To establish a violation, a plaintiff need only prove that the terms and conditions of a defendant's NPDES permit (or, in California, the provisions of the State Order) were breached. See 33 U.S.C. §§ 1311(a), 1342(k); *see also* Hawaii's Thousand Friends v. City and County of Honolulu, 821 F. Supp. 1368, 1392 (D. Ha. 1993) ("courts throughout the county have held that NPDES compliance is a matter of strict liability and a defendant's intent and good faith are irrelevant").

///

///

1   A citizens suit like the instant lawsuit may be filed

2 "against any... person who is alleged to be in violation of... an

3 effluent standard of limitation under this chapter.  33 U.S.C. §

4 1365(a)(1).  The term "effluent standard of limitation under this

5 chapter" is broadly defined to include "unlawful" discharges of

6 pollutants (33 U.S.C. § 1365(f)(1) and 1311 (a)), as well as

7 violations of any "permit or any condition thereof" (33 U.S.C. §

8 1365(f)(6).

9   The CWA provides that dischargers found to be in violation

10 of their permits/orders may be ordered to pay civil penalties of

11 up to $27,500 per day for each violation.  33 U.S.C. §§ 1319(d)

12 (as amended by 40 C.F.R. § 19.1 - 19.4 (Dec. 31, 1996), 1365(a);

13 State Order, Section C.15.a.

14

15                          **FACTUAL BACKGROUND**

16

17   Defendant AG Industrial Manufacturing, Inc. (hereinafter

18 "AIM") is an industrial manufacturing facility engaged in the

19 fabrication of agriculture machinery, especially equipment used

20 in harvesting wine grapes.  The business, which employs

21 approximately 40 people, has been located at 110 South Beckman

22 Rd. in Lodi, California, since its inception in 1980.  Defendant

23 Claude E. Brown is President of AIM, and has served in that

24 capacity since the company was formed.  Currently, AIM has a net

25 worth of approximately $907,000.

26 ///

27 ///

28 ///

Plaintiff WaterKeepers Northern California (hereinafter "WaterKeepers") is a non-profit corporation dedicated to the preservation and protection of the San Francisco Bay and the Delta estuary.  WaterKeepers alleges its investigation of the AIM premises, which began on or about August 8, 1999, revealed fabrication activities generating industrial pollutants that occurred outside in uncovered areas exposed to rainfall.[1] WaterKeepers further contends that AIM's facility contains rusting equipment and parts also exposed to the weather, and points to the presence of oily stains, waste materials and debris.  Because of exposure to storm water flows and lack of essential structural controls like grading, berming and roofing, WaterKeepers further alleges that both storm water flows and wash water from clean-up activities contain industrial contaminants.

On June 28, 2000, Waterkeepers sent a letter to AIM putting them on notice of these alleged shortcomings, and charging AIM with violations of the Clean Water Act, as well as violations of the various California regulations designed to implement the provisions of the CWA, including the State Order.[2]  Despite WaterKeepers claim that "extensive investigation" preceded this notice, no testing of dust or storm water discharge was undertaken beforehand.

---

[1]AIM disputes this, indicating that it recently has installed domed structures over fabrication areas, which are no longer exposed to the weather.

[2]Although this Court initially granted summary judgment in favor of AIM on grounds that this notice was jurisdictionally deficient, the Ninth Circuit disagreed and remanded the matter for further consideration on the merits of the claims presented. Consequently, this Memorandum will not address issues pertaining to the sufficiency of  WaterKeepers' June 28, 2000 notice.

In fact, the only investigation that took place consisted of photographs taken by a WaterKeepers member, Plaintiff Bill Jennings, on August 8, 1999 along with a short subsequent visit by Jennings and an environmental engineer, Steven Bond. That visit was so abbreviated that Mr. Bond did not even get out of the car.

AIM's two shareholders, Mr. Brown and Plant Manager Paul Burkner, allege they were unaware of the CWA or its potential applicability to the AIM facility until receiving WaterKeepers' June 28, 2000 letter. Because AIM's SIC numbers are 3500 and 3523, its facility is not subject to regulation under 40 C.F.R. Subchapter N and, as enumerated above, AIM is consequently not bound to specific effluent limitations on that basis, although with the advent of the CTR in May of 2000 it was subject to effluent limitation as to certain pollutants, including zinc, lead, copper, aluminum and lead.

While Claude Brown remained unsure as to whether the CWA in fact applied to their facility, he discovered that other businesses in the Lodi area that received similar notices from WaterKeepers and had retained a licensed engineer, Dan Barber, to assist them with compliance efforts. Brown ultimately retained Mr. Barber.

With Dan Barber's assistance, AIM submitted a NOI to signify its intent to comply with the State's Order on July 7, 2000, less than two weeks after receiving notification from WaterKeepers that it was operating without the necessary NOI.

///

///

8

1  AIM thereafter proceeded with development of an SWPPP, which was

2  adopted on July 21, 2000 and included BMPs intended to mitigate

3  any pollutant discharge from its facility.  By October 4, 2000,

4  less than two months later, AIM installed a containment and

5  partial storm water treatment system consisting of berms and an

6  oil/water separator drain at a total expense of over $32,0000.

7  AIM also initiated a sweeping program to collect dust and

8  particulate matter generated as a result of its industrial

9  activities.

10      Despite these efforts, and AIM's expenditure of over $32,000

11 in consulting fees to Dan Barber in addition to the cost of the

12 BMPs outlined above, WaterKeepers initiated the present lawsuit

13 against AIM on September 12, 2000, even though WaterKeepers had

14 received AIM's SWPPP beforehand and had not put AIM on notice as

15 to any perceived shortcomings of that SWPPP.  WaterKeepers'

16 complaint contains five causes of action.  AIM is alleged 1) to

17 have wrongfully discharged pollutants without an NPDES Permit in

18 violation of 33 U.S.C. § 1311(a); 2) to have discharged

19 contaminated storm water in violation of the State's Order,

20 pursuant to 33 U.S.C. §§ 1311(a) and 1342; 3) to have discharged

21 non-storm water in violation of the Order and 33 U.S.C. §§ 1311

22 and 1342; 4) to have failed to develop and implement an adequate

23 SWPPP as required by the Order; and 5) to have failed to develop

24 an Adequate Monitoring and Reporting Program.[3]

25

26      [3]WaterKeepers has alleged that these violations were present
   at the time of the filing of the complaint.  Although AIM argues
27 that it had corrected any violations prior to that time, and
   contends that this actions is therefore barred under Gwaltney of
28                                                     (continued...)

1    Although AIM is not subject to specific effluent limitations

2    as a non-Subchapter N discharger, WaterKeepers nonetheless points

3    to Special Conditions C(1) and C(2) of the Order, which precludes

4    any pollutant discharge which causes, or threatens to cause,

5    impairment of beneficial uses of an affected waterway.  Because

6    that portion of the Mokelumne River passing through Lodi has been

7    classified by the Central Valley Regional Water Quality Control

8    Board ("CVRWQCB") as a protected waterway due to zinc and copper

9    impairment, WaterKeepers claims that AIM is subject to those

10   conditions.  WaterKeepers allege that AIM has consequently

11   violated the Order's provisions ever since the October 1, 1992

12   deadline it established for developing and implementing an

13   adequate SWPPP.

14       WaterKeepers further alleges that because the California

15   Toxics Rule became effective as to the pertinent portion of the

16   Mokelumne River as Of May 18, 2000, that Rule created further,

17   and more restrictive, limitations on AIM after that time.

18

19        [3](...continued)

20   Smithfield Ltd. v. Chesapeake Bay Foundation, Inc., 484 U.S. 49
     (1987), in fact Gwaltney requires only an allegation of ongoing

21   noncompliance at the time a complaint is filed.  Id. at 64.
     WaterKeepers has made such allegations here, as recognized by the

22   Ninth Circuit's previous assessment of this case in
     WaterKeepers Northern California v. AG Industrial Mfg. Inc., 375

23   F.3d 913 (9th Cir. 2004).  The Ninth Circuit recognized that
     WaterKeepers' complaint clearly alleges continuing and recurring

24   violations of the CWA.  Id. at 921, n. 7.  This means that AIM
     cannot rely, for example, on allegations that there was no

25   rainfall between the time the CTR was implemented on May 18,
     2000, and the time the instant complaint was filed on September

26   12, 2000, to allege that no violation of the CTR, and, in turn,
     the CWA, occurred.  WaterKeepers' allegations that the CWA was

27   being violated at the time it filed this complaint are sufficient
     for jurisdictional purposes, and as discussed below, the merits

28   of WaterKeepers' claim in this case in fact hinges on the results
     of later testing.

1    While it is undisputed that AIM submitted an SWPPP prior to

2  commencement of this complaint, WaterKeepers alleges that the

3  provisions of that SWPPP are inadequate.  While it appears

4  undisputed that the oil/water separator was successful in

5  removing total organic compounds ("TOCs") and total suspended

6  solids ("TSSs") from AIM's storm water discharges (*see* Statement

7  of Undisputed Fact[4] No. 222), and while it was those oil and

8  grease related pollutants that figured prominently in

9  WaterKeepers' initial criticism of AIM's facility maintenance and

10  operation, WaterKeepers' primary thrust at this point revolves

11  around the alleged presence of dissolved metals in AIM's storm

12  water runoff following implementation of its SWPPP.

13    According to WaterKeepers, neither the separator nor the

14  berming addresses the presence of those metals.  It is undisputed

15  that testing performed in conjunction with AIM's SWPPP continues

16  to reveal the presence of lead, zinc, copper, iron and aluminum

17  well in excess of both EPA Benchmark levels and the standards set

18  forth in the CTR.  (Fact No. 107).  WaterKeepers contends that

19  this testing shows conclusively that AIM has not implemented

20  proper BMPs, and is consequently liable under the CWA.  AIM

21  counters by arguing that it did not initially address the

22  presence of many of those metals, and in particular lead, zinc,

23  and copper, because it does not use those materials in its

24  manufacturing processes.

25  ///

26

27    [4]The parties have consecutively numbered the various
undisputed facts alleged in this matter.  Subsequent references
to those facts will be denominated as "Fact",  followed by

28  citation to the Fact number in question.

11

AIM alleges that, in attempting to discover the source of these elevated metal levels, it has performed testing on both corrugated metal roofing and a galvanized chain link fence that encircles its premises.  AIM argues that its analysis in that regard reveals that both the fence and roof are leaching metals into the storm runoff, especially zinc, and to a lesser extent, lead and copper.  It has coated both the roof and portions of the fence in question in order to minimize any further metals runoff. (Fact No. 116; Brown Decl., ¶ 37).

While WaterKeepers denies that only the fence and/or roof is responsible for the presence of such metals in AIM's storm water, it has failed to come forward with evidence showing that either lead, zinc or copper[5] are in fact otherwise in use at the facility.  With respect to zinc, for example, while WaterKeepers attempts to argue that AIM's product list shows it uses a certain kind of solder containing zinc, AIM counters by pointing out that the particular solder in question is only used for repairs off-site.  No evidence is presented to show that zinc is used in manufacturing operations and consequently comes from anywhere other than the fence and/or roof.  AIM points to the Order's provisions which only require testing of pollutants "that are likely to be present... in significant quantities."  State Order, Section B, ¶ 5.c.ii.  Because the metals at issue were not used in its manufacturing operations, AIM consequently maintains that no testing was indicated.

_____

[5]During the course of the May 16, 2005 oral argument in this matter, however, counsel for AIM did admit that AIM uses a "modest" amount of copper in its manufacturing operations.

While AIM, as a Category 10 discharger[6] under the terms of the State Order, is subject to an exemption from compliance for pollutants not generated from industrial processes themselves, and although AIM claims it falls within that exemption because both the fence and roof are "separate from the plant's industrial activities", WaterKeepers alleges that because any water coming into contact with the fence/roof is mixed with storm water directly coming into contact with industrial components, and that therefore all the runoff by definition must comply with CTR standards.[7]

In addition to arguing that AIM's SWPPP is *per se* inadequate because of the continuing presence of metals even after implementation of BMPs, WaterKeepers also points to certain inadequacies in the SWPPP itself, including most notably the contention that the site map contained within the SWPPP does not meet applicable guidelines.  WaterKeepers goes on to contend that AIM has also failed to adequately monitor its emissions as required by the terms of the State Order.

///

---

[6]It is undisputed that the type of facility operated by AIM is identified in Category 10 of Attachment 1 of the State Order, and that consequently AIM is a Category 10 discharger.  Fact No. 223.

[7]The State Order, at Attachment 4, ¶ 9, specifically defines "Storm Water Associated with Industrial Activity" for a Category 10 discharger as "...storm water discharges... where material handling equipment or activities, raw materials, intermediate products, final products, waste materials, by-products, or industrial machinery are exposed to storm water."  The Order goes on to exclude for Category 10 discharges "areas located on plant lands separate from the plants's industrial activities... as long as the drainage from the excluded areas is not mixed with storm water drained from the above described areas...."  Id.

Finally, WaterKeepers also advances the argument that in addition to generating non-compliant storm water, AIM also is liable for the emission of polluted non-storm water discharge generated, for example, by truck and equipment washing at its facility.

Although it is undisputed that absolutely no contaminant testing was done prior to issuance of the June 2000 Notice to AIM, WaterKeepers nonetheless takes the position in this lawsuit that AIM should be assessed with civil penalties for all past violations of the State Order within the applicable statute of limitations period, or since 1995. Using that time period and after referring to precipitation tables showing all significant rainfall events in the Lodi area, WaterKeepers contends in its motion that AIM has violated the CWA on at least 237 separate occasions since September 12, 1995. Citing Section 309(d) of the CWA, which calls for a maximum civil penalty of $27,500 for each violation (see 3 U.S.C. § 1319(d) and 33 U.S.C. § 1365(a)), WaterKeepers alleges that total fines of between $87,375,000 and $96,112,500 are indicated. Although WaterKeepers goes on to suggest that a more reasonable fine in this instance would be $5,000,000, that figure is still well in excess of AIM's net worth in the amount of $907,000.

///
///
///
///
///
///
///

14

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Rule 56 also allows a court to grant summary adjudication on part of a claim or defense.  *See* Fed. R. Civ. P. 56(a) ("A party seeking to recover upon a claim ... may ... move ... for a summary judgment in the party's favor upon all or any part thereof."); *see also* Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995); France Stone Co., Inc. v. Charter Township of Monroe, 790 F. Supp. 707, 710 (E.D. Mich. 1992).

The standard that applies to a motion for summary adjudication is the same as that which applies to a motion for summary judgment.  See Fed. R. Civ. P. 56(a), 56(c); Mora v. ChemTronics, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party.  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

///

///

15

Once the moving party meets the requirements of Rule 56 by
showing that there is an absence of evidence to support the non-
moving party's case, the burden shifts to the party resisting the
motion, who "must set forth specific facts showing that there is
a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 256 (1986).  Genuine factual issues must exist that
"can be resolved only by a finder of fact, because they may
reasonably be resolved in favor of either party." Id. at 250.
In judging evidence at the summary judgment stage, the court does
not make credibility determinations or weigh conflicting
evidence. See T.W. Elec. v. Pacific Elec. Contractors Ass'n, 809
F.2d 626, 630-631 (9th Cir. 1987), citing Matsushita Elec. Indus.
Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

**ANALYSIS**

A.  Discharge of Pollutants without a Permit.

     In its First Cause of Action, WaterKeepers alleges that
Plaintiffs are discharging pollutants without a valid Notice of
Intent ("NOI") in place as required by Section 301(a) of the CWA,
33 U.S.C. §§ 1311(a) and 1342(p)(2)(B).  As indicated above,
while the CWA requires individual polluters to obtain an NPDES
permit for any industrial discharge, the EPA has delegated to the
states, and in this case California, the authority to administer
CWA compliance through a statewide general permit (the "State
Order"), for which dischargers must submit a NOI.
///

Although the language of the First Cause of Action also refers to the discharge, by AIM, of pollutants in violation of the State Order, that claim relates to the Second Cause of Action (alleging discharge of contaminated storm water in violation of the State Order's conditions), and the First Cause of Action itself is denominated specifically as targeting only AIM's alleged discharge without the necessary permit (here a NOI and ensuing SWPPP).

Although WaterKeepers alleges that AIM has impermissibly failed to takes steps to subject itself to the CWA ever since it was required to do so on March 30, 1992, the fact remains that AIM filed a NOI to comply with the provisions of the Order on July 7, 2000, and proceeded to submit a SWPPP on July 21, 2000. Both these dates are well before the instant complaint was filed on September 12, 2000.

While WaterKeepers' complaint appears to seek redress for AIM's failure to submit a NOI earlier, it is undisputed that WaterKeepers performed no testing on any discharge from the AIM facility prior to commencement of this action.  Beyond mere conjecture, WaterKeepers has no proof that AIM was discharging pollutants in excess of maximum levels until after this action was filed, and AIM began testing its storm water discharges pursuant to its SWPPP.  Consequently WaterKeepers has no proof that AIM was required to submit to the Order sooner than it did, and because AIM did file a NOI prior to the filing of this lawsuit there can be no violation for failure to obtain a permit as envisioned by the First Cause of Action.  Hence summary adjudication as to that claim in favor of AIM should be granted.

17

1  B.   Discharge of Contaminated Storm Water.

2

3       Through its Second Cause of Action, WaterKeepers asserts

4  that AIM is liable under the CWA, as implemented by the State

5  Order, for discharge of polluted storm water from its facility

6  into storm drains ultimately flowing into the Mokelumne River.

7       In opposing WaterKeepers' motion and through its own cross

8  motion for summary judgment, AIM spends substantial time in

9  arguing that WaterKeepers has not established that its storm

10 water flows either generally into a "navigable water" of the

11 United States (so as to be subject to the provisions of the CWA),

12 or specifically into the Mokelumne River in this instance.  That

13 argument can be summarily dispatched, however, inasmuch as the

14 term "navigable water" broadly encompasses any manmade canal of

15 storm sewer system that may ultimately flow into a waterway of

16 the United States at some juncture.  Headwaters, Inc. v. Talent,

17 243 F.3d at 534.  Given that interpretation, the fact that AIM's

18 storm water flows into the City of Lodi's storm drain system is

19 enough to trigger CWA protection since it is undisputed that

20 under some circumstances, and at certain times, that system

21 ultimately flows into the Mokelumne.

22       AIM's argument that its water quality must be measured at

23 the time storm water actually flows into a navigable water (as

24 opposed to the time it exits the AIM facility) is equally

25 misplaced.  As WaterKeepers points out, accepting AIM's argument

26 in this regard would essentially make it impossible to determine

27 just what pollutants were discharged from the AIM facility.

28 ///

Moreover, AIM's argument amounts to a contention that it is entitled to a dilution credit for other storm water discharge.  A dilution credit is a limited regulatory exception that must be preceded by a site specific mixing zone study.  *See* Lazerow Decl., Ex. F, Implementation Plan, §§ 1.4.1, 1.4.2.2, pp. 13-15, and Appendix 5.  It is undisputed that AIM's current permit does not provide for a mixing zone, and it is further uncontroverted that AIM has never applied for any dilution credit.  Fact Nos. 249, 250.  Hence the concept of a dilution credit/mixing zone is inapplicable to this case.

We must next address the merits of WaterKeepers' claim that AIM is violating the CWA through its storm water discharge. Analyzing that question necessarily entails an assessment of the various types of pollutants allegedly discharged by AIM.  In order to rule in favor of either party as a matter of law, the Court must decide whether WaterKeepers has conclusively established that certain pollutants are being discharged, or alternatively whether AIM can establish that WaterKeepers has come forward with no evidence to show that any violation occurred, hence militating in favor of summary judgment on AIM's behalf.

As indicated above, it appears to be undisputed that the oil-water separator installed by AIM as a BMP has eliminated petrochemical residues like TOCs and TSSs as polluting factors in AIM's stormwater discharge.  See WaterKeepers' response to Fact No. 222 ("WaterKeepers are not alleging that Defendants have failed to achieve BCT for TOC and TSS").

///

1  The remaining substances at issue are various dissolved metals.[8]
2  It is uncontroverted that storm water discharged from the AIM
3  facility on December 14, 2000 and March 2, 2001 exceeded the CTR
4  criteria for both zinc and copper. (Fact Nos. 101, 103).  It is
5  further undisputed that on November 12, 2001, discharge of not
6  only copper and zinc, but also aluminum, iron and lead, exceeded
7  the CTR.  (Fact No. 105).

8      AIM argues that it does not use either zinc or lead in its
9  manufacturing processes.  It asserts that testing done on a
10 corrugated metal roof, as well as the chain link fence
11 surrounding the AIM facility, suggests that those structural
12 components, as opposed to anything associated with industrial
13 processes that are subject to CWA provisions, are responsible for
14 testing detection of those metals.  As indicated above, a
15 Category 10 discharger like AIM is not required under the terms
16 of the State Order to monitor storm water discharge coming from
17 plant areas not directly associated with industrial activity
18 unless discharge from those areas is mixed with industrial
19 runoff.  In addition, to the extent that dissolved metals are not
20 likely to be present in "significant quantities", AIM is not
21 required to monitor the presence of such substances in any event.
22 State Order, Section B, ¶ 5.c.ii.

23     Given these criteria, and in light of evidence submitted by
24 AIM, summary adjudication as to dissolved metals in AIM's storm
25 water discharge cannot be had.

26 _____

27     [8]While the State Order also mandates that storm water
   discharge be analyzed for pH and specific conductance,
   WaterKeepers has presented no evidence suggesting violations in
28 those areas.

First, there are triable issues with respect to whether AIM uses
certain of the metals in its industrial processes at all, let
alone whether they are used in significant enough quantities to
require monitoring.  While WaterKeepers initially argued, for
instance, that one type of solder used by AIM contained zinc, AIM
has refuted that argument through evidence that that particular
kind of solder was used only for off-site work.   In addition,
although WaterKeepers has pointed out that collected particulate
matter (sweepings) taken from the AIM facility show elevated lead
concentrations, AIM still claims that it uses no lead in its
manufacturing operations, and claims that such sweepings may
relate to a prior industrial tenant at its plant site.  At a
minimum, this creates a triable issue of fact.  Moreover, aside
from the admission, by counsel for AIM at oral argument on this
motion, that AIM uses a "modest" amount of copper in its
operations, there is otherwise no discussion of that issue in the
papers and the Court cannot conclude as a matter of law that
copper was used in a significant enough way to require AIM's
testing for that metal.  Finally, although testing has revealed
levels of aluminum and iron that exceed (in some instances only
slightly) CTR criteria, the papers do not illuminate whether
those substances are used in AIM's industrial activities in a
significant enough quantity to have warranted monitoring.

///

///

///

///

///

1    Although WaterKeepers correctly points out that the State

2   Order makes AIM (as a Category 10 discharger under the terms of

3   said Order) liable for pollutant exceedances if storm water

4   polluted as a result of contact with AIM's industrial processes

5   is "mixed" with pollutants emanating from other, non-industrial

6   portions of the company's physical plant like the corrugated

7   metal roof or chain link fence.[9]  In that instance, under the

8   terms of the State Order, AIM would be liable for elevated

9   pollutant levels in their entirety even though some of the

10  pollutants would have been exempt under the terms of the Order

11  had they not been combined with strictly industrial run-off.

12    Whether or not storm water coming into contact with

13  industrial areas of the AIM facility was "mixed" with areas that

14  would not be subject to the purview of the State Order, like the

15  roof or fence, necessarily entails factual assessment not

16  amenable to determination on summary judgment.  AIM has presented

17  evidence, for example, to show that the fence and/or roof leach

18  both zinc and copper into storm water.   Whether contaminated

19  runoff from those areas is mixed with water coming into contact

20  with other areas of the AIM plant that are subject to the State

21  Order is also a question of fact.

22  ///

23  ///

24  ///

25  ///

26  ///

27  _____

28      [9]*See* State Order, at Attachment 4, ¶ 9, as discussed in n.
    7, *supra*.

C.   Discharge of Contaminated Non-Storm Water.


     In its Third Cause of Action, WaterKeepers argues that AIM
is also liable for discharging pollutants through its dispersal
of non-storm water.  It appears to base that contention solely on
an allegation that hosing and washing have been observed at the
facility, as well as on the fact that AIM's July 21, 2000 SWPPP
lists certain BMPs to be followed with respect to truck and
equipment washing.  The Declaration of Claude Brown, however,
states that water is not used to clean equipment or parts, and
explains that the little water that is used in AIM's
manufacturing operations is not discharged into the storm water
system.  Brown Decl., ¶ 20.

     WaterKeepers' claim that hosing and washing have been
observed appears to relate only to one instance where an employee
was observed using a hose.[10]  No evidence was presented that
water from this hose was exiting the AIM facility through the
storm water drain.  In addition, while WaterKeepers points to two
photographs of what appears to be a man pushing water located in
the gutter adjacent to the AIM facility, those photographs do not
indicate just what the man is doing, or whether the puddle at
issue represents non-storm water or the remaining vestiges of a
precipitation event.

_____

     [10]The only other activity cited by WaterKeepers appears to
involve air conditioning condensate which, prior to installation
of the oil/water separator drain, flowed through an outfill pipe
at the east side of South Beckman Road.  That pipe was eliminated
though construction of the separator drain, and in any event air
conditioning condensate is exempt from monitoring under the State
Order.  State Order, D.1a at p. 5.

They are not in themselves sufficient to create a triable issue

of fact.  AIM is entitled to summary adjudication as to the Third

Cause of Action.[11]

D.  Failure to Develop and Implement an Adequate SWPPP.

        In attacking the adequacy of AIM's SWPPP in its Fourth Cause

of Action, WaterKeepers takes issue with multiple components of

both the initial SWPPP, and the SWPPP as amended by AIM in June

of 2001.  WaterKeepers alleges that AIM has not identified all

"significant materials" and potential pollution sources as it is

required to do under the terms of the State Order.  *See* State

Order, Sections A.2, A.6, A.7.  Pointing to the elevated levels

of dissolved metals detected after implementation of the SWPPP,

WaterKeepers argues that the presence of those metals in AIM's

industrial activities has not been properly disclosed.  It

asserts that no reference is made to raw materials or to

intermediate, final or finished products handled and stored on

site.  Fact No. 87.  WaterKeepers also claims that activities

generating particulate dust (in which lead was detected) have not

been detailed.

///

///

_____

        [11]The mere fact that AIM's initial SWPPP contains a section
pertaining to BMPs for non-storm water discharges dos not itself
create a triable issue of fact given AIM's claim that it
currently emits no such discharge, and WaterKeepers' failure to
present any competent evidence to the contrary.  AIM claims that
its SWPPP contained a section on non-storm water discharges
solely as a precautionary measure.

1    With respect to BMPs designed to reduce or prevent
2 pollutants in storm water, WaterKeepers goes on to assert that
3 AIM's SWPPP contains no discussion whatsoever of the
4 effectiveness of each BMP in alleviating pollutant discharge, and
5 does not identify BMPs for certain types of pollutants like
6 contaminated materials tracked from certain areas of the facility
7 to other areas that are exposed to storm water flows.  In related
8 fashion, WaterKeepers further asserts that the site map required
9 by AIM's SWPPP fails, even after its amendment, to adequately
10 drainage areas within its facility boundaries, to identify storm
11 water discharge and sampling points, and to identify areas of
12 soil erosion, particularly with respect to the employee parking
13 lot.

14    AIM takes issue with these assertions, claiming that is
15 required to sample only for mineral elements likely to be present
16 in a significant amount.  State Order, Section B, ¶ 5.c.ii at p.
17 27.  As already discussed above, it claims that because it does
18 not use certain of the dissolved metals in its manufacturing
19 operations, it was not required to disclose those metals in its
20 SWPPP.  While that may be true for certain of the metals at issue
21 like zinc and copper, the Court cannot conclude as a matter of
22 law that the same conclusion is warranted for lead given the
23 detection of metal shavings at the facility containing
24 substantial lead.  That creates, at minimum, a triable issue of
25 fact.

26    WaterKeepers' other criticisms of AIM's SWPPP also raise
27 numerous factual issues not amenable to determination through
28 summary judgment.

1  Whether or not AIM's use of an aggressive sweeping program to

2  deal with tracking issues, for example, cannot be decided as a

3  matter of law.  Similarly, the technical inadequacies of AIM's

4  site map in terms of drainage flow and erosion potential is also

5  not an appropriate candidate for resolution through summary

6  judgment, whether in favor of either AIM or WaterKeepers.[12]

7  Summary adjudication as to the Fourth Cause of Action is

8  therefore denied.

9

10  E.  Failure to Develop an Adequate Monitoring Program.

11

12      As part of its monitoring and reporting obligations under

13  the Order, a permittee like AIM must conduct visual observations

14  of storm water from one storm event per month during the wet

15  season, take storm water samples at every discharge location from

16  at least two storms each year (one of which should be the first

17  storm of the season), analyze the samples for specific

18  contaminants and file annual reports with the Regional Board

19  summarizing the visual observations and results of sample

20  analyses.  State Order, Sections B.3-B.5, B.14.

21  ///

22  ///

23

24      [12]WaterKeepers further alleges that the site map is
inadequate in not identifying where significant spills or leaks
25  have occurred, as required by Section A.4.d of the State Order.
AIM counters by arguing that the area of oil staining identified
26  by WaterKeepers in that regard was caused by prior occupants of
the site, and that consequently AIM was not required to disclose
27  the existence of that area on its site map.  This also creates a
triable issue of fact with respect to the cause and origin of the
28  stains, and any resulting obligation on the part of AIM.  *See*
Fact Nos. 138, 235, 236.

26

1  WaterKeepers argues that AIM failed to perform the required
2  monthly visual inspections, asserting that its claim that no
3  significant rainfall occurred during certain months is
4  contradicted by publicly available rain data.  WaterKeepers
5  further claims that AIM failed to sample storm water from the
6  first storm of the 2000-01 rainy season, as it was required to
7  do.  WaterKeepers also contends that AIM's first annual report
8  was submitted a week late.

9        Resolution of these issues, like the claimed inadequacies of
10 the SWPPP itself as identified by WaterKeepers, all are
11 inappropriate on summary judgment.  AIM's contention that it was
12 not obligated to test water from the first storm of the season on
13 October 10 and 11, 2000, for example, is premised on an argument
14 that the interceptor drain was surrounded by crushed rock at that
15 time that served to absorb the storm water before it could enter
16 the drain.  That raises issues of fact, as does the issue of
17 whether testing of certain contaminants like lead was performed
18 with too high a detection limit to pass muster under the
19 monitoring requirements.  Finally, as already indicated above,
20 there is a factual issue with respect to whether AIM was required
21 to test for lead in the first place, given its assertion that no
22 lead was used in its manufacturing process versus WaterKeepers'
23 argument that shaving samples from the facility disclosed lead in
24 significant amounts.  Summary adjudication as to the Fifth Cause
25 of Action cannot be granted.

26 ///

27 ///

28 ///

27

F.  Liability of Claude Brown.

     Although it is undisputed that AIM is a corporation (Fact
No. 134), WaterKeepers nonetheless contends that AIM's President,
Claude Brown, is subject to personal liability under the CWA
pursuant to the "responsible corporate officer" doctrine.  It is
undisputed that Mr. Brown runs day to day operations at the AIM
facility, and is responsible for compliance with environmental
laws and regulations, like the CWA.  Fact Nos. 12-15).

     33 U.S.C. § 1319[c)(6) provides that in addition to the
definition of a "person" subject to enforcement action under the
CWA (§ 1362(5) includes a corporation within that definition),
any responsible corporate officer may also be held liable.    In
its motion for summary judgment, AIM argues that Mr. Brown must
be dismissed as a defendant because WaterKeepers has failed to
demonstrate that Mr. Brown knew that AIM was committing any CWA
violations.

     In United States v. Iverson, 162 F.3d 1015 (9th Cir. 1998),
the Ninth Circuit considered the application of the responsible
corporate officer doctrine in the context of a CWA case.  In that
case, the defendant, who was President of a company which
manufactured chemical products, including acid cleaners and
heavy-duty alkaline compounds, personally ordered the discharge
of wastewater residue already refused by the local sewer
authority.  Because the defendant faced criminal charges under
the CWA, the Ninth Circuit considered the scope of the
responsible corporate officer doctrine as it applied to the
defendant.

1    Significantly, the _Iverson_ court determined that the

2    principles of an earlier Supreme Court case, _United States v._

3    _Dotterweich_, 320 U.S. 277 (1943), applied under the CWA.  162

4    F.3d at 1023.  _Dotterweich_ opined that "[t]he offense (there a

5    violation of the Federal Food, Drug, and Cosmetic Act) is

6    committed... by all who do have... a responsible share in the

7    furtherance of the transaction which the statute outlaws."

8    _Dotterweich_, 320 U.S. at 284.

9    A later case also cited approvingly by _Iverson_, _United_

10   _States v. Park_, 421 U.S. 658, 668 (1978) held that a corporate

11   president cannot escape liability, teven if he delegated

12   decision-making control over the activity in question to a

13   subordinate.  _Park_ found that the question for the jury is

14   whether the corporate officer had "authority with respect to the

15   conditions that formed the basis of the alleged violations."  _Id_.

16   at 674.  After considering _Park_, the _Iverson_ court found that its

17   refinement of the "responsible corporate officer" doctrine

18   applied under the CWA.  _Iverson_, 162 F.3d at 1024.

19   AIM correctly points out that Iverson is a criminal case

20   with facts more egregious than those of the case at bar.

21   Nonetheless, the responsible corporate officer doctrine has been

22   applied to both criminal and civil cases. *See, e.g.,* _United_

23   _States v. Hodges X-Ray, Inc.,_ 759 F.2d 557, 561 (6th Cir. 1985).

24   This Court cannot say as a matter of law that Claude Brown is not

25   liable in this matter, and consequently his request for summary

26   adjudication is denied.

27   *///*

28   *///*

29

F.   Motion to Strike Declaration of Daniel K. Barber.

     To support both its opposition to WaterKeepers' Motion for
summary judgment and in support of its own cross-motion in that
regard, AIM has submitted a lengthy, 32 page declaration from
Daniel K. Barber, the environmental engineer it retained to
develop both an adequate SWPPP, and to assist AIM in the
monitoring and testing required by the SWPPP.  WaterKeepers has
moved to strike portions of the Barber declaration, primarily on
grounds that portions of that declaration go beyond the scope of
Mr. Barber's August 15, 2001 expert report.  WaterKeepers argues
that is would be prejudiced if Barber is now permitted to offer
opinions outside the parameters of his report, which formed the
basis of WaterKeepers' October 5, 2001 deposition of Mr. Barber.
WaterKeepers further argues that certain statements made by
Barber, particularly with respect to information he obtained from
Claude Brown to the effect that no significant petrochemical
spills had occurred at AIM's facility, and concerning Brown's
statement to Barber that AIM uses no lead in its manufacturing
processes, should be excluded as inadmissible hearsay.

     In opposition, AIM points out that Barber is not only an
expert witness, but also the individual retained by AIM to ensure
its compliance with the provisions of the State Order.  As such,
AIM contends that Barber is also a percipient witness as to the
steps he took, after his expert report itself was submitted, in
furtherance of that objective.  According to AIM, it provided
ample notice to WaterKeepers of Mr. Barber's activities in that
regard.

Prior to Mr. Barber's October 5, 2001 deposition, for example, counsel for AIM provided WaterKeepers with a draft declaration that both updated Mr. Barber's efforts and put WaterKeepers on notice that additional events to ensure compliance would likely occur.  Moreover, in stipulating to extend discovery from January 18, 2002 to April 18, 2002, counsel for AIM told WaterKeepers that Mr. Barber was taking additional steps to investigate the source of ongoing zinc discharge, including the possibility that the galvanized chain link fence at the AIM facility was responsible for that discharge.  WaterKeepers declined to further depose Mr. Barber despite the fact that this was specifically discussed.  AIM's counsel also indicated his willingness to further extend the discovery cut off date, a suggestion not taken up by WaterKeepers.

In essence, WaterKeepers position is that Barber was obligated to prepare a formal supplemental expert report, and because he did not do so WaterKeepers claims prejudice in not being able to reexamine Barber on the basis of such a report. AIM counters that in fact WaterKeepers was amply apprised of what was happening as outlined above, and that much of Barber's activities were as a percipient witness in any event not subject to the strictures of expert disclosure pursuant to Federal Rule of Civil Procedure 26(a)(2) and 37{c)(1).

Under the circumstances, WaterKeepers' arguments appear to parse technicalities too closely.  Barber's ongoing efforts to achieve CWA compliance on AIM's behalf are in a percipient witness capacity, and in any event counsel for AIM appear to have kept WaterKeepers informed as to just what Barber was doing.

31

1   Given that fact, WaterKeepers' efforts to claim prejudice appear

2   to miss the mark, and Mr. Barber's failure to provide a

3   supplemental report will not invalidate the opinions expressed in

4   the declaration at issue herein.

5        WaterKeepers' remaining objections to the Barber declaration

6   are also overruled.  Contrary to WaterKeepers' assertions to the

7   contrary, the matters in question are relevant.  In addition,

8   while the Barber declaration does refer to certain statements

9   made by Claude Brown as indicated above, those statements are

10  made in the context of actions taken by Mr. Barber (in preparing

11  the site map with respect to oily staining at the facility and

12  with respect to what Mr. Barber did to test for lead) and are

13  consequently not being offered for the truth of the matter

14  asserted.  Hence they do not constitute inadmissible hearsay

15  within the context of the Barber declaration.  Finally,

16  WaterKeepers' assertion that Mr. Barber's testing with respect to

17  zinc discharge from galvanized fencing does not run afoul of

18  Federal Rule of Evidence 702 and 703 in terms of scientific

19  methodology.

20       For these reasons, WaterKeepers' Motion to Strike is denied,

21  except with respect to those portions of ¶ 54 of the Barber

22  Declaration which AIM has agreed to withdraw.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

**CONCLUSION**

For the reasons stated above, neither WaterKeepers nor AIM has established their entitlement to summary judgment as to this entire action.   Consequently both their requests in that regard are denied.   Summary adjudication in favor of AIM, however, is granted as to the First and Third Causes of Action.   Summary adjudication is otherwise denied.   In addition, WaterKeepers' Motion to Strike the Declaration of Daniel K. Barber is also denied, except with respect to those portions of ¶ 54 of said declaration which AIM has agreed to withdraw.

IT IS SO ORDERED.

DATED: August 19, 2005

_____
MORRISON C. ENGLAND, JR
UNITED STATES DISTRICT JUDGE